# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| ANTONIA WILCOXON,<br><br>Plaintiff,<br><br>v.<br><br>RAMSEY ACTION PROGRAMS, INC.,<br><br>Defendant. | Civil No. 04-92 (JRT/FLN)<br><br>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

William J. Egan, **WILLIAM J. EGAN, PLC**, 315 Edina Executive Plaza, 5200 Willson Road, Edina, MN  55424, for plaintiff.

Teresa M. Thompson and Lindsay J. Zamzow, **PARSINEN KAPLAN ROSBERG & GOTLIEB, P.A.**, 100 South Fifth Street, Suite 1100, Minneapolis, MN  55402, for defendant.


Plaintiff Antonia Wilcoxon brings suit against her former employer alleging race discrimination, retaliation, and reprisal in violation of Title VII, the Minnesota Human Rights Act, and a local ordinance, and violation of the Americans with Disabilities Act. The defendant moves for summary judgment on all claims, which, for the following reasons, the Court grants.


## BACKGROUND

Plaintiff Antonia Wilcoxon began working for defendant Ramsey Action Programs, Inc. ("RAP"), a non-profit organization providing services to low-income residents of Ramsey and Washington Counties on October 23, 2000 as the Assistant Director of Early Childhood Services (Head Start).  Her responsibilities included

supervision of the associate directors and assisting in the day-to-day operation of the program in consultation with her supervisor, Director Morris Manning.

Manning recruited Wilcoxon to apply for the position and, following an interview, hired her. In connection with her application and hiring, Wilcoxon was asked to complete an "Applicant Flow Record" and a "Medical History Report" identifying and detailing any disabilities, handicaps, or medical problems. Wilcoxon disclosed an unidentified disability and ongoing treatment for depression. The forms were kept in separate, confidential files.

According to Manning, Wilcoxon's first six months at RAP went very well. On May 31, 2001, Manning gave Wilcoxon a positive six-month review, noting that her work exceeded the requirements of the position. As early as January 2001, however, Wilcoxon began to feel that she was not being given authority or autonomy commensurate with her job description, that the work she did was underappreciated, that other employees did not respect her, and that she had been hired as a "token" person of color. In response to Wilcoxon's concerns and at Wilcoxon's suggestion, Manning changed her title to Deputy Director and advised the program staff that this better reflected his view of Wilcoxon's position. Wilcoxon also felt underpaid, since two of the employees she supervised were paid more than she was paid. Wilcoxon believed there was a racial component to these issues.

In July 2001, Wilcoxon sent an email to Karen Schechter, the Human Resources Director, complaining of "blatant racism and sexism" in the Head Start program. (Thompson Aff. Ex. K.) Schechter and Raul Esparza, the Affirmative Action Director, followed up with Wilcoxon. Although Schechter noted in her response to Wilcoxon that

Schechter could be "more helpful to [Wilcoxon] with more specific information," Wilcoxon declined to provide "instances and names," *id.*, but mentioned "some of the hirings and misfits in certain areas of the program" and related that she heard complaints about racism or sexism from other employees on a daily basis (Wilcoxon Dep. at 180). Wilcoxon asked Schechter to "trust my years of experience . . . when I state my concerns they are based on true facts I have observed not rumors." (Thompson Aff. Ex. K) Wilcoxon commented to Esparza that "black managers were not appreciated," (Esparza Dep. 8), but did not otherwise provide either of them with any details. Nevertheless, on Wilcoxon's recommendation, RAP implemented diversity and cultural awareness training for all Head Start staff.

Near the end of the summer, Wilcoxon met with Manning, Esparza, Schechter, and Dale Anderson, RAP's Executive Director, to discuss the results of an investigation into claims of race discrimination against several supervisors in the Head Start program.[1] In August 2001, one of the supervisors involved, Kathy Klumb, was promoted. At the meeting, Wilcoxon protested Klumb's promotion to Anderson. Esparza also expressed concerns about Klumb's ability to be a manager and about Klumb having referred to "colored" people in an interview with Esparza. Wilcoxon questioned whether the others would support her if she took steps to discipline employees for inappropriate behavior in these areas. Anderson assured her of his support. Shortly thereafter, Manning chastised

---

[1] The investigation stemmed from an incident in late fall 2000 in which a Head Start employee, Kathy Klumb, had used the term "KKK" in a lesson on phonics. When Wilcoxon questioned Klumb about the incident, Klumb professed ignorance about the civil rights movement, claiming to have been out of the country at the time, and asserted that she was referring to her initials. Klumb was reprimanded and a warning placed in her personnel file, and was required to participate in sensitivity training. Wilcoxon believed that Klumb should have been terminated.

Wilcoxon for complaining to Anderson about his decision to promote Klumb and emphasized that she needed to make any complaints through proper channels.

Throughout the fall, Wilcoxon continued to bring her concerns about institutional racism to Anderson, Manning, and other employees. For example, on September 12, she circulated a memorandum entitled "Upcoming Undoing Racism Training" recommending that staff attend a training program. On September 24, she circulated a memorandum stating that "our behavior around here does not often reflect respect or sensitivity towards those different from us" and encouraging staff to read together and discuss the book "And Don't Call Me a Racist!" – A Treasury of Quotes on the Past, Present, and Future of the Color Line in America. (Egan Aff. Ex. 11.) On November 15, 2001, Wilcoxon circulated an email article entitled "White Privilege Shapes the U.S."

In September, after Wilcoxon was offered another job at a higher salary, Manning agreed to give Wilcoxon a raise, retroactive almost five months. By November, however, Wilcoxon's relationship with some staff and with Manning in particular had deteriorated. For example, during one meeting, an outside consultant expressed concern that the program was deficient in the way it treated children, particularly children of color. The consultant also stated that teachers seemed to not expect enough of their students and had expressed surprise that certain students had exceeded those expectations. Wilcoxon believed that the consultant's comments reflected the programs' lack of attention to the well-being of children of color. When teacher Kate Bonestroo observed that there could be other explanations for the consultant's findings, Wilcoxon reacted strongly, ordering her out of the room. Wilcoxon later apologized to Bonestroo, attributing her emotional response in part to her cultural background, but declined to meet with Bonestroo and

Manning without her attorney. Manning believed that Wilcoxon was overly focused on race and/or gender, was unreasonably quick to ascribe discriminatory motives to innocent or, at least, more complex situations, and was unwilling to recognize that her behavior, tone, or manner might be creating tension among the staff.

On November 26, Wilcoxon met with Manning. She expressed her frustration with her job, and asserted that Manning, other employees, and the program were racist and that she had been discriminated against because of her race. According to Manning's deposition testimony, he "realized that [he] was looking at a situation here that [he] was probably going to terminate this person's employment. If this was the way things were going to go, there was no way that [he] was going to be able to mend this fence and make this work." (Manning Dep. at 148.) The two agreed that the relationship was not working out. Again according to Manning, the following exchange then took place. Wilcoxon stated, "Well, I can't work here," to which Manning replied, "Are you resigning?" She replied, "Yes, I'm resigning." *Id*. at 149. According to Wilcoxon, she did not actually intend to resign at that point. Rather, she spoke rashly in the heat of the moment, and intended only to reevaluate her tenure at the program.

On December 4, Manning sent Wilcoxon a memorandum asking her to "please let me know by 8:00 a.m. Thursday, the date of your resignation or if you are rescinding your decision of the 26th." (Egan Aff. Ex. N.) Wilcoxon responded that she would "rescind my decision to resign, but would like to present you with a proposal" which she was preparing with her attorney. (Egan Aff. Ex. O.) Following a meeting between Schechter, Anderson, Esparza, Manning and legal counsel at which, according to Manning, the decision was made not to permit Wilcoxon to rescind her resignation,

Manning completed another job performance evaluation. Manning expressed dissatisfaction with Wilcoxon's communication abilities, perceived emphasis on program and staff deficits rather than strengths, ability to integrate with and work flexibly with Manning and other staff. However, he noted that she had made impressive efforts to seek outside funds and opportunities for the program. On December 9, Manning sent Wilcoxon a memorandum regarding the performance review, which stated:

> Under normal circumstances your accomplishments would be considered solid, even noteworthy in some instances. . . . However, as my review will note, actions have been taken and attitudes exhibits by yourself that have sabotaged your relationship with me and ultimately undermine your accomplishments.
>
> * * * *
>
> In the past five months . . . our working relationship has gone terrible awry. I can only conclude from recent incidents that I can no longer work with you. You have said that you believe Ramsey Action Programs and specifically Early Childhood Services are, in significant ways failing poor children, particularly children of color because of racism and that we are at legal risk because of racist behavior.
>
> * * * *
>
> You recently called me a racist – and reiterated this assertion several times. You also characterized my relationship with Terry Davis, the Program's Regional Program Officer, as being racist. You have also characterized Kate Bonestroo as racist as well. I have zero toleration for that kind of characterization applied to me and I know from working extensively with Kate that she is not a racist. I no longer trust your professional judgment. I find your communication unacceptable, even for a person in your senior management position at Ramsey Action Programs.
>
> * * * *
>
> It is unavoidably apparent, however, that for reasons of incompatibility that I cannot continue to have you as part of the team. Therefore, I am recommending termination of your employment to Dale Anderson effective Friday, December 14, 2001.

(Egan Aff. Ex. Q.)

On December 17, 2001, by letter from the Human Resources Director, RAP informed Wilcoxon that it had accepted her resignation. (Egan Aff. Ex. S.) In a memorandum, Manning also told Wilcoxon, "I am not in a position to accept the rescinding of your resignation of November 26, 2001." (Egan Aff. Ex. R.)

Subsequently, some RAP employees circulated a petition to the Board of Directors objecting to Wilcoxon's termination/leaving, complaining that it was racially biased, and complaining of overall racial bias in the program. Wilcoxon met with Anderson and Board Chair Paul Gaston in January, 2002. Anderson later reported to the Board that Wilcoxon would not be reinstated, but that they were investigating her allegations of discrimination against kids within the Head Start program. In March, the Board hired an outside firm to investigate the allegations racial discrimination. The consultants concluded, in part, that RAP did not adequately recruit and retain staff that reflected the the student population, that some curriculum was culturally insensitive or racially offensive, and that students and staff were treated differently based on race. Manning was subsequently terminated, and Anderson's contract was allowed to expire.

Wilcoxon now alleges race and disability discrimination and retaliation under Title VII, § 1981, the MHRA, and St. Paul Civil Rights Ordinance § 183.[2] Defendant asserts that plaintiff cannot establish a prima facie case for any of her claims and moves for summary judgment. For the following reasons, the Court grants defendant's motion for summary judgment.

---

[2] Wilcoxon stipulates to the dismissal of her national origin discrimination claim.

**ANALYSIS**

I.  **SUMMARY JUDGMENT STANDARD**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*  Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party.  *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  *Vette Co. v. Aetna Cas. & Sur. Co.,* 612 F.2d 1076, 1077 (8th Cir. 1980).  However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial.  *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

**II.   CLAIMS**

Wilcoxon's race discrimination, retaliation, and reprisal claims are analyzed under the familiar burden shifting standard enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Griffith v. City of Des Moines*, 387 F.3d 733, 736-37 (8th Cir. 2004) (reaffirming that claims under Title VII, including race discrimination claims, are analyzed under *McDonnell Douglas*); *Eliserio v. United Steelworkers of America Local 310*, 398 F.3d 1071, 1078 (8th Cir. 2005) ("To analyze a claim of retaliation under Title VII, we apply the *McDonnell Douglas* three-part burden shifting analysis."); *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1124 n.2 (8th Cir. 2000) (noting that race discrimination claims under the MHRA are analyzed under the Title VII standard); *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001) ("A reprisal claim [under the MHRA] is analyzed under the McDonnell Douglas burden-shifting test."); *Fisher Nut Co. v. Lewis ex rel. Garcia*, 320 N.W.2d 731, 734 (Minn. 1982) ("claim[s] of discrimination under the St. Paul ordinance [are] governed by the standards developed under Title VII Laws"). Under *McDonnell Douglas*, the plaintiff first is required to establish a prima facie case of discrimination. The burden of production then shifts to defendant to assert a legitimate reason for the allegedly discriminatory action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant is able to do so, the burden shifts back to the plaintiff to establish that the asserted legitimate reason was merely a pretext for a discriminatory action. *Id.* at 804.

**A.   Race Discrimination**

In order to establish a prima facie case of race discrimination, plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was qualified for the

job in question; (3) she suffered an adverse employment action; and (4) the facts permit an inference of discrimination. *Taylor v. Southwestern Bell Tel. Co.*, 251 F.3d 735, 740 (8th Cir. 2001). The Court finds that RAP is entitled to summary judgment on this claim because Wilcoxon has not established sufficient facts permitting an inference of discrimination.

Wilcoxon's positive six-month review, mixed twelve-month review, deteriorating relationship with Manning, but positive relationship with other staff create, at least, a question of fact as to whether Wilcoxon was qualified for her position. Furthermore, Manning's and Wilcoxon's conflicting recollection of and interpretation of the events and conversations relating to Wilcoxon's departure from RAP raise a question of fact as to whether she resigned or was terminated. However, there is simply no evidence that Wilcoxon's alleged termination was due to or based on her race.[3] Rather, it is very clear to the Court that her termination was based on an irresolvable personality conflict between Wilcoxon and Manning. That the conflict stemmed from their differing perceptions of racial issues within the agency and the best pace and manner in which to handle those issues does not transform the conflict into one based on Wilcoxon's race. To the contrary, the record indicates that Manning sought Wilcoxon's application for the job; hired her; made efforts to retain her at the agency; and ultimately accepted her resignation/terminated her. *See Herr v. Airborne Freight Corp.*, 130 F.3d 359, 362-63 (8th Cir. 1997) ("There is a strong inference that discrimination was not a motivating

---

[3] Wilcoxon's assertion that two of the middle-managers that she supervised were paid more than she was does not support her claim because (1) one of the women was African American; and (2) their long-term employment at RAP provides a legitimate, non-discriminatory reason for the disparity, which is unrebutted.

factor if the same person hired and fired the plaintiff within a relatively short period of time.").

### B.     Retaliation and Reprisal

A prima facie case of retaliation or reprisal requires a plaintiff to demonstrate that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between her protected conduct and the adverse action. *LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688 (8th Cir. 2001); *Hoover*, 632 N.W.2d at 548. The Court finds that RAP is entitled to summary judgment on this claim because Wilcoxon has not established that she engaged in protected activity.

In the employment discrimination context,[4] protected activity refers to complaints about or resistance to discriminatory *employment practice*, as opposed to general environment.[5] *See Evans v. Kansas City, Missouri Sch. Dist.*, 65 F.3d 98, 101 (8th Cir. 1995) (dismissing Title VII complaint based on the plaintiff's concerns about school's implementation of a desegregation plan rather than the school's employment practices). Thus, Wilcoxon's complaints of and efforts to remedy what she perceived to be a culture of discrimination in the program do not constitute protected activity.

After carefully reviewing all of the evidence submitted in this case, and Wilcoxon's deposition and briefing in particular, the Court concludes that Wilcoxon's

---

[4]The Court disagrees with Wilcoxon's assertion that the MHRA, which arguably is broader in scope than Title VII, can be read so broadly as to protect non-employment practice related activity. The case cited by counsel during the hearing, *Behrens v. Metropolitan Airports Com'n*, 2005 WL 1607408 (D. Minn. Jul. 8, 2005), is inapposite as it discusses the range of retaliatory actions, that is, adverse employment actions, covered by the MHRA.

[5]Although creation, tolerance, or maintenance of a hostile work environment may constitute a discriminatory employment practice, Wilcoxon does not allege a hostile work environment in this action.

several references to arguably discriminatory employment practices are too few and too conclusory to permit a jury to find that Wilcoxon participated in protected activity. Wilcoxon asserts that she complained to Esparza, that at least one associate director "was clearly slanted" in awarding promotions and had treated a Hmong candidate and a Caucasian candidate for a center management position differently. (Wilcoxon Dep. at 134-35.) Generally, Wilcoxon believed that program needed to "be more open for hiring and promoting and training and development." *Id*. Wilcoxon provides little detail about this one incident, and no information about what, if any, response she received from Esparza, other incidents of discriminatory employment practices, or whether her complaints on this matter ever made their way to Manning. Thus, the above evidence cannot satisfy either the protected activity prong or the causation prong of Wilcoxon's prima facie case.

### C.     Disability Discrimination

At the time of her application and at the time of her hire, Wilcoxon was asked to complete an Applicant Flow Record and a Medical History Report detailing her medical and disability history. The Applicant Flow Record was kept in a confidential file in the affirmative action office, while the Medical History Report was maintained in a confidential portion of the personnel file, inaccessible by any supervisors. Neither form was ever referenced or used, and Wilcoxon does not allege that she was discriminated against based on the information contained in the forms. Rather, she maintains that it was a violation of the Americans with Disabilities Act ("ADA") to ask her for the information.

Although a plaintiff need not be disabled in order to establish a violation of 42 U.S.C. § 12112(d)(4)(A), she "must . . . establish that [the] violation of the ADA caused some sort of tangible injury." *Cossette v. Minn. Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999) (indicating that "being treated in a condescending and patronizing manner" by one's coworkers would not constitute the requisite injury) (*citing Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594-95 (10th Cir. 1998) (permitting suit by "all job applicants who are subjected to illegal medical questioning *and who are in fact injured* thereby" (emphasis added)); *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 562 (5th Cir. 1998) (requiring plaintiff to show "some cognizable injury in fact" that is "something more than a mere violation" of the statute)); *Johnson v. Moundsvista, Inc.*, 2002 WL 2007833, at *5 (D. Minn. Aug. 28, 2002) (requiring tangible injury in order to sustain a claim under the MHRA). As Wilcoxon has not alleged an injury resulting from the collection of this information, she cannot establish a violation.[6]

---

[6] Additionally, a claim for violation of the medical information confidentiality provisions of the MHRA may only be brought by a qualified individual with a disability, which Wilcoxon is not. *See State by Cooper v. Hennepin County*, 425 N.W.2d 278 (Minn. Ct. App. 1988).

Furthermore, although Wilcoxon brings her claim under 42 U.S.C. § 12112(d)(4), which applies to current employees, the Court believes that, given the timing and type of the requests, section (d)(3) is more applicable to the instant situation. Section (d)(3) permits an employer to require a medical examination or inquire as to disability post-offer/pre-employment, provided that all entering employees are required to submit the same information, the information obtained is treated confidentially and maintained separately from other files, and the results are not used improperly. 42 U.S.C. § 12112(d)(3). As there is no dispute that all employees were required to complete the forms and that the information was properly maintained and never used, there was no violation of the ADA.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Docket No. 9] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:   September 12, 2005  
at Minneapolis, Minnesota.

                                            s/ John R. Tunheim  
                                             JOHN R. TUNHEIM  
                                          United States District Judge